PROPRIETORS OF BOSTON PIER OR THE LONG WHARF & others *vs.* CENTRAL WHARF AND WET DOCK CORPORATION & others.

A. and B., who were the owners of adjoining wharves, and of the space between, established a division line between their respective estates, which ran through the open space between the wharves, at a distance of one hundred and fourteen feet from the principal part of the line of A.'s wharf, and seventy-six feet from B.'s, and mutually agreed that there should be an open dock and common passage for all vessels of every description, with free ingress and egress therefor, between said wharves, and that neither party would erect any building or place any fixtures therein, nor permit any vessels to be stationary at a greater distance than sixty-six feet from their respective sides of the dock. The outer end of A.'s wharf protruded into the dock fifty feet, and there diminished by that number of feet the space for ingress and egress of vessels. Subsequently, certain encroachments having been made into the dock by each party, a new agreement was entered into, establishing new lines, by which B. was allowed to extend his wharf, at the outer end thereof, sixteen feet further into the dock, it being expressly understood and agreed " that no more than one vessel at a time shall ever be permitted to lay stationary at the berth made by said projection;" and A. was allowed to continue his projection of fifty feet, above referred to, a short distance further along his wharf, and to have the right to lay two vessels abreast thereof, stationary. *Held,* that by the restriction above mentioned, B. was not limited to one vessel of the size then in use or known at that port; but that he might lay at said projection one vessel of any size, not exceeding sixty-six feet in width.

BILL IN EQUITY praying for an injunction to restrain the defendants from using a berth at the end of Central Wharf in Boston Harbor for certain steamships, or any other vessels of such width as would interfere with the plaintiffs' rights. The following facts are all which are now material:

In 1814 the wharf and dock property now owned by the Central Wharf and Wet Dock Corporation was owned by Ebenezer Francis, and the northerly line of the wharf was then a straight line extending far out into the harbor. The main part of the dock lying to the north of Central Wharf was one hundred and ninety feet wide; and upon the north of the dock was Boston Pier or the Long Wharf, which extended somewhat further into the harbor than Central Wharf. At the outer end of Long Wharf was a T or projection, which reached fifty feet into the dock, and continued one hundred and thirty-one feet from the end of the wharf. This brought the projection to a point within about fifty feet of opposite to Central Wharf, as then built.

On the 21st of December 1814, Ebenezer Francis and the Proprietors of Boston Pier or the Long Wharf entered into an indenture reciting that said parties were " desirous of adjusting the boundaries between their respective estates, and of establishing between them a dock and common passage-way for ships, vessels, boats, &c., and for that purpose of making the exchanges, conveyances and contracts hereafter set forth." The indenture then provided that Mr. Francis released and conveyed to the said proprietors all his right, title, interest and estate in and to the wharf and flats lying northerly of a straight line through the dock, and parallel to and one hundred and fourteen feet southerly from the southerly cap of Long Wharf; " reserving however to himself, his heirs and assigns forever, in certain parts of the foregoing premises, inclosed in bounds hereafter set forth, the use and right of an open dock and passage-way for vessels, and so forth, in conformity to the intentions and agreements of the parties hereinafter expressed." And the said proprietors released and conveyed to Mr. Francis all their right, title, interest and estate in and to all the land and flats lying south of said line through the dock; with a similar reservation to that made by Mr. Francis. " And in furtherance of the views of the parties, and in consideration of the premises, the said parties, for themselves, their respective heirs, successors and assigns, do hereby mutually covenant, bargain and agree that there shall be, and they do hereby mutually grant to each other, their respective heirs, successors

and assigns forever, an open dock and common passage-way for all ships, vessels, boats and floats of every description, with free ingress and egress therefor, to and from their respective wharves and estates, and in and over the following described piece of land and flats, constituting part of the above described premises, that is to say : " [The description, towards the outer ends of the wharves, which alone is here material, was, on the north side of the dock, " five hundred and seventy-six feet along the southerly line of Long Wharf to the T at the end thereof, then southerly about fifty feet by the T to the corner thereof, then easterly by the said T to the channel ; " and, on the south side of the dock, " a straight line parallel to the southerly line of Long Wharf above referred to, and one hundred and ninety feet distant therefrom."] " And it is mutually understood and agreed that each party is entitled to, and may receive for their own use, the dockage of all vessels, ships, boats and floats lying within the part of said dock which lies contiguous and adjoining to their respective estates." " It is also mutually understood and agreed that neither of the parties shall erect any building or place any fixtures within the bounds above described as said dock, nor permit any vessels to be stationary at a greater distance than sixty-six feet from their respective sides of the dock as above described, nor unnecessarily impede or obstruct the passage to and fro from any part or place within said dock."

Afterwards, the Central Wharf and Wet Dock Corporation having succeeded to the title and estate of Mr. Francis, an indenture was entered into on the 20th of September 1834 between that corporation and the Proprietors of Boston Pier or the Long Wharf, referring to the former indenture, and reciting that " whereas, since that time the said Central Wharf has at various points on its northerly line projected into said dock and encroached thereon, now therefore to avoid any collision or disagreement between the respective proprietors of said wharves in consequence of said encroachments, or of any encroachments of a like nature by said Long Wharf which may have taken place on the northerly side of said dock, it is hereby mutually agreed " as follows : 1. " The Central Wharf and Wet Dock Corporation

shall be permitted to widen the northeastern end of their wharf, by extending the same northerly into the open dock, not exceeding sixteen feet further than the original bounds, as described in the afore-mentioned indenture, and may carry the said extension one hundred feet in length from the northeastern corner of said wharf westwardly ; " " it being expressly understood and agreed by the Central Wharf and Wet Dock Corporation that no more than one vessel at a time shall ever be permitted to lay stationary at the berth made by said projection." " The Proprietors of Boston Pier or the Long Wharf shall be permitted to extend the projection of fifty feet now existing on their southerly line at the eastwardly end of Long Wharf, so far westwardly as not to exceed sixty feet from the present western capsill of said projection, so as to make two ships' berths in length, and shall have the right to lay two vessels abreast stationary at the western extension hereby permitted, and no more." " All encroachments of the Long Wharf and of Central Wharf into the channel, or into said dock, existing at the time of the execution of these presents, shall be deemed to be fully sanctioned and confirmed hereby." " The projections into the dock permitted by this indenture shall be thereafter considered a part of the permanent boundaries of the respective wharves on the dock, and a plan shall be taken of the Central Wharf and Long Wharf, including the said dock between the same, after the alterations herein mentioned shall be completed, and said plan shall form a part of these presents, and be considered as the legal bounds of all parties interested therein." " It is hereby agreed and understood that no part of this indenture shall be considered as authorizing either party to encroach upon or in any way obstruct the common passage-way of the dock, except as herein provided by this indenture ; but the said passage-way shall remain open for the free ingress and egress of all vessels or craft to and from either wharf, as is provided by the indenture dated December 21, 1814," between Mr. Francis and the proprietors aforesaid.

By another indenture dated December 5th 1856, it was " agreed that Central Wharf and Long Wharf Corporations shall be allowed to make an additional wall of piles outside

of their present wharf structures," "as far down as the jog on Central Wharf," [where the projection of sixteen feet authorized by the last indenture had been built,] "and as far down as the easterly end of Long Wharf; provided that said additional wall of piles shall not extend at any point more than twelve feet into the dock from the present established line of either wharf structure."

By *St.* 1840, *c.* 19, the Central Wharf Corporation were authorized to extend their wharf to the harbor commissioners' line established by *St.* 1837, *c.* 229, and, in pursuance of this authority, in 1840, they extended their wharf about one hundred and forty-five feet easterly towards the channel.

The relative positions of these wharves, and the changes thus made, will appear by the following plan, in which the heavy solid lines represent the lines of the dock as they were fixed by the indenture of 1814; the line marked "Division Line" represents the line then fixed as the division line between the two estates; the light solid lines represent the changes authorized by the indenture of 1834; the heavy dotted lines represent the changes authorized by the indenture of 1856; and the light dotted line shows the extension of Central Wharf built under authority of *St.* 1840, *c.* 19.

Long Wharf.

W. E.

Division Line.

Ocean

Central Wharf.

The plaintiffs alleged that the various extensions into the dock thus authorized have all been made, except that the additional wall of twelve feet authorized by the last indenture has not yet been built for about two hundred and fifty feet at the outer end of Long Wharf; that extensions have thus been made so far that thereby the dock has been reduced at the narrowest part of its entrance to one hundred and thirty feet in width, [there is a small variation in this result from the figures stated in the indentures, caused probably by the fact alleged in the answer that the Central Wharf Corporation have not yet built out the whole width of sixteen feet authorized by the indenture of 1834,] and that the further extension of twelve feet into the dock when made will reduce the same to one hundred and eighteen feet in width.

The plaintiffs further alleged that in 1834 the ordinary width of vessels then in use was thirty feet; that vessels of that width are still in common use; that with vessels of that width it is practicable for one vessel to lie at the berth at the northeasterly end of Central Wharf, and two vessels to lie abreast at the opposite berth at the southeasterly end of Long Wharf, and still leave a convenient passage to the part of the dock above; and that till recently said corporations did so use their said berths, and did reserve and leave such convenient passage ; but that recently the Neptune Steamship Company, (who were made defendants,) lessees of said berth at the northeasterly end of Central Wharf, have with the sanction and consent of the Central Wharf Corporation, from time to time brought to and had lying at said berth, at the narrowest part of the entrance to the dock, steamships of great length and fifty-eight feet breadth of beam, being one of their line of tri-weekly steamers between Boston and New York, and thereby are actually occupying such a width of the dock as to make it impossible for the plaintiffs to use their opposite berths for two vessels abreast, of the width of thirty feet each, and at the same time leave any passage to the dock above.

The defendants in their answer admitted the building of the various extensions into the dock, as alleged, except that where,

by the indenture of 1834, the Central Wharf Corporation were authorized to erect an extension of sixteen feet wide, it did, at the westerly end of the line of one hundred feet long, extend out only about eleven feet, and at the easterly end only five feet eight inches; they alleged their belief that in 1834 ships of greater breadth of beam than thirty feet were not uncommon, and were well known in the harbor of Boston, though they deemed this fact immaterial; that if the various extensions authorized were built, and one vessel of thirty feet wide were to lie at the end of Central Wharf, and two vessels of that width were to lie abreast opposite, there would not remain between them a passage for a vessel of the same size into the dock above; but that it is lawful and reasonably convenient for vessels lying at those berths to make way for other vessels to gain ingress and egress, whenever necessary, and vessels lying at those points hold their berths subject to the burden of thus making way, whenever required by the wharfingers; and they claimed the right to occupy their said berth by any ships, one at a time, of such width as not to extend more than sixty-six feet from the side of Central Wharf.

A list was put into the case of all the vessels registered and enrolled at the port of Boston during the year 1834, together with the breadth and tonnage of the same, by which it appeared that the largest ship was of five hundred and thirty-two tons and a fraction, and thirty feet breadth.

The case was reserved by *Gray*, J., for the determination of the whole court, upon the bill, answer, replication and proofs, all of which sufficiently appear in the foregoing statement.

*B. F. Thomas & G. W. Phillips*, for the plaintiffs. The language of the indenture of 1834 should be construed in reference to the breadth of ships in common use at that time, which was thirty feet, and the right restricted to the use of it by such ships. *Atkins* v. *Bordman*, 2 Met. 457, 468. *Davis* v. *Muncey*, 38 Maine, 90. The cases of grants of water-rights, where a designation of a factory with so many spindles, or water to carry so many trip-hammers, is held to be a measure of power, recognize the same principle. *Biglow* v. *Battle*, 15 Mass. 313. *Tourtellot* v. *Phelps*, 4 Gray, 370. The present is a case of mutual grant

and reservation ; and, in view of the width of the entire dock at the point in question, and of the fact that here was an apportionment of the berth room between the parties, there is only one possible construction. If the defendants may put one vessel of sixty-six feet width there, the plaintiffs may put two such vessels there ; which is impossible.

Even if, in other cases, such a right would not be confined to ships of the breadth in use at the time of .the grant, but would be enlarged with the increased breadth required by improvement in ships, yet this case has elements which require a construction peculiar to itself. The width of entrance to the dock was about one hundred and thirty feet. Two things were to be accomplished, namely, a free, open, uninterrupted passage to the dock, and a right of berth room to the respective parties, in the exact proportion of two to one. In other words, the allotted space was to be divided between them in the proportion of one third to Central Wharf and two thirds to Long Wharf, subject to the keeping of an open passage between their two berths. By the indentures of 1814 and of 1834 neither party was to " unnecessarily impede or obstruct " the passage. And, by the indenture of 1834, the right to the two parties was, to have one and two vessels, respectively, lie stationary at the berths made by the projections. To " unnecessarily impede or obstruct " the passage, under the indenture of 1814, meant, by allowing vessels to delay or linger in making their entrance and exit. The clauses could not refer to vessels occupying the berths made by the extension, because the provisions for them were made twenty years later, and because the right, under the second indenture, was for the vessels to lie stationary. The liability to removal, to accommodate other vessels, was not contemplated, because, in that view, no stationary berth would have been possible.

*J. A. Andrew,* for the defendants, cited *Commonwealth* v. *New Bedford Bridge,* 2 Gray, 339 ; *Hey* v. *Appleyard,* 32 Eng. Law & Eq. R. 213.

HOAR, J. This case is one of great commercial importance ; has been elaborately argued ; and has received the fullest consideration of the court.

The rights of the respective parties depend upon the contracts between them contained in the indentures of 1814, 1834, and 1856, which have been given in evidence; and the principal question at issue is upon the true construction of a single clause in the indenture of 1834.

In 1814, the plaintiffs, who were then as now the proprietors of the Long Wharf, and Ebenezer Francis, the owner of the estate now known as Central Wharf, under whom the defendants claim, made an indenture, for the purpose of establishing their boundaries, and creating and defining their respective rights in the dock lying between the wharves. By this indenture a division line was fixed between the estates, laid down on a plan to which it referred, and running the whole length of the dock. The limits of the open dock were also established, within which it was agreed that neither party should erect any buildings or place any fixtures; and it was stipulated that neithei should " permit any vessels to be stationary at a greater dis. tance than sixty-six feet from their respective sides of the dock " described, " nor unnecessarily impede or obstruct the passage to and from any part or place within said dock." Each granted to the other, and covenanted that there should thereafter be " an open dock and common passage-way for all ships, vessels, boats and floats of every description, with free ingress and egress therefor, to and from their respective wharves and estates, and in and over the land and flats " described as constituting the dock.

By this instrument the boundaries of the two estates were settled, and the rights of the parties defined, as they now exist, except so far as they have been modified by the subsequent indentures. But it is very important to consider exactly what rights were thus established, in order more clearly to understand the modification afterward agreed to.

The leading object of the parties was manifestly to increase the convenience of enjoyment of their respective estates. This could be effected by using a part of them in common as a dock and passage, and devoting to that use all of the interval between the wharves, except so much as might from time to time be

required for berths, for vessels loading and unloading. Each party would desire to use the part of the dock adjoining its own wharf for the purpose of laying vessels at the wharf, and to devote the whole of its own territory to that use, so far as the occasions of commerce might require, and so far as was consistent with a reasonable freedom of ingress and egress. The Long Wharf and Central Wharf were among the principal and most important wharves of Boston; and it cannot be supposed that either party intended to give up the right of access to them which the capacity of their own side of the dock would admit, for any vessels which the commerce of the city should employ. The distance between the wharves at the narrowest point would not permit the occupation of the prescribed width of sixty-six feet on each side for the berths of vessels, and leave a space between them for ingress and egress equal to the width of vessels which then came to the port. But under the indenture of 1814, if larger ships than those in use between that date and 1834 had been constructed and used, there was nothing in the contract to prevent either of the parties from receiving them in the dock. And we are of opinion that, by the just construction of that indenture, the right to lay vessels at the respective wharves must have been regarded as so far subordinate to the right to a free access to the dock, that while vessels of any size might have been received and laid in the dock, provided the limit of sixty-six feet on either side was not exceeded, it would have been with an obligation to move them if the right of free and unobstructed passage required it. The indenture of 1814 did not limit the number of vessels which either party might place abreast at their respective wharves, except by the number of feet which they could occupy.

In consequence of encroachments on the dock made in violation of the previous agreement, the indenture of 1834 was executed. It sanctioned and confirmed all existing encroachments of either party, and authorized certain extensions of the wharves into the dock to be made. This permission was coupled with the condition that at the extension made by the Central Wharf Proprietors nearest to the entrance of the dock, " no more than

one vessel at a time shall ever be permitted to lay stationary at the berth made by said projection;" and at a projection farther westward " no more than two vessels abreast;" and that at an extension of the Long Wharf which was authorized opposite the first named, the Proprietors of Long Wharf " shall have the right to lay two vessels abreast and no more," with a like right at another projection farther westward. It was farther stipulated that nothing in the indenture should be considered as authorizing either party to encroach upon or in any way obstruct the common passage-way of the dock, except as therein provided; but the said passage-way should remain open for the free ingress and egress for all vessels or craft to or from either wharf.

The plaintiffs' case rests upon the proposition, that the restriction upon the defendants above recited must be construed to prohibit the occupation of dock room at the place specified for more than the width of one vessel of the size of which vessels resorting to the port of Boston were then built. In other words, they contend that the word " vessel " was used as a recognized measure of space, and that the object and intent of the contracting parties could not be accomplished by any other rule of interpretation.

The reasoning in support of this claim is certainly forcible, and entitled to great consideration. But after giving it all the weight to which we think it entitled, it is not satisfactory to the minds of a majority of the court.

It is not, in the first place, the literal import of the language used by the parties. Under the indenture of 1814, either party was at liberty to place as many vessels abreast as they chose, if they did not collectively exceed the limitation of the sixty-six feet. If the vessels were small, they could place more of them. If they exercised their full privilege at the narrowest part of the dock, it would be subject to the necessity of moving some of the vessels whenever it was necessary to give an unobstructed passage in or out. The object of the restriction in 1834 was undoubtedly to compensate for the reduced width of the dock occasioned by the new projections, by limiting the space to be occupied by stationary vessels; and we are asked of what avail

it could be for this purpose to limit the defendants to one vessel, if that one was to be as wide as any two had ever been, and might singly occupy the whole space permitted under the previous indenture ? The answer must be that there is no reason to suppose that in 1834 the parties contemplated the increase in the size of vessels which has since occurred. If they had foreseen it, we have no means of knowing how it would have affected their agreement. Whether either party would have consented to exclude from a part of their dock and wharf any single ship of a kind which might be found best adapted to the purposes of commerce, may well be doubted. The change in the dimensions of vessels which impairs the force of a restriction expressed in the terms which the parties chose to employ, might, if foreseen, have prevented them from using any other than the very phrase which they adopted.

In the next place, it must be remembered that the stipulation as to laying one or two vessels at the places indicated in the indenture is in the nature of a restriction, and not of a grant. We do not understand it as affecting the provision in the indenture of 1814 that no vessel should be stationary at a greater distance than sixty-six feet from the respective sides of the dock. All the provisions of that indenture continue in force, except so far as they are expressly controlled by the subsequent contract. The limit to one vessel is of value, because while some vessels are larger than the largest then in use, others are smaller; and by the literal and express terms of the agreement, but one vessel can be placed where it is so stated, even if it is but fifteen or twenty feet in width. The parties may have regarded the probabilities as to the average size of vessels, and chosen rather to limit the number than to define the space to be occupied. They had a right before to occupy sixty-six feet. They agreed for the future that but one vessel should be stationary there, whether it occupied more or less of the sixty-six feet. There is therefore not only a possible, but a practical and natural operation which can be given to the agreement, without changing its terms.

But there is another consideration which should not be overlooked, and which has a strong bearing upon the construction

to be adopted.   The men who made the contract knew very well the size of the vessels which were then in use.   In the in-denture of 1814, the space to be occupied by vessels had been distinctly defined by measurement.   Measurements are given in the indenture of 1834.   The parties had minute surveys and plans to which they refer.   If they had meant by " vessel " a space not more than thirty-five feet in width, to be occupied by one or more vessels at the pleasure of the respective proprietors, it would have been easy and natural, and in conformity with the previous practice, to say so.   But, instead of fixing any measure-ment, they use the phrase " one vessel," and accompany the use of it by the stipulation that " all vessels " are to have free in-gress and egress to and from either wharf.

It is a rule of frequent application in the interpretation of con-tracts, that the court must not only consider the purpose which the parties intended to accomplish, but the mode in which they have chosen to attempt the execution of their purpose.   If their intent is made effectual at all, it must be by the means they propose.   If an unforeseen change of circumstances makes those means less effective in producing the desired result, it will not do for the court to substitute others, to which the contracting parties have not assented.   Thus in *Hunt* v. *Rousmaniere*, 1 Pet. 1, the parties had agreed on a security for a debt, intended to be valid and complete, but which, by the death of one of them, became inoperative ; but it was held that even a court of equity had no power to decree another security to be given, dif-ferent from that which they had selected.

The majority of the court are therefore of opinion that the main proposition upon which the plaintiffs' bill rests cannot be maintained.   The parties have not, upon a fair construction of the indenture of 1834, made " a vessel " a term of measurement, and they have each a right to lay one or two vessels at the parts of their wharves at which they are restricted to one or two re-spectively, of any size, provided that they lay them upon their own side of the dividing line between their estates adopted in 1814, and that they do not go beyond the sixty-six feet from the line of their respective wharves.          *Bill dismissed with costs.*